## STATE OF CONNECTICUT *v.* ERROL DEHANEY
### (SC 16247)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued January 15—officially released August 13, 2002

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Robert M. Spector*, special assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Rosita M. Creamer*, senior assistant state's attorney, and *John F. Fahey*, assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. After a jury trial, the defendant, Errol Dehaney, was convicted of one count of capital felony in violation of General Statutes § 53a-54b (8) and two counts of capital felony in violation of § 53a-54b (9),[1] three counts of murder in violation of General Statutes § 53a-54a,[2] and two counts of risk of injury to a child in violation of General Statutes (Rev. to 1995) § 53-21,

---

[1] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (8) murder of two or more persons at the same time or in the course of a single transaction; or (9) murder of a person under sixteen years of age."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ."

as amended by No. 95-142 of the 1995 Public Acts.[3] The trial court, *Spada, J.*, sentenced the defendant to three consecutive terms of life imprisonment without the possibility of release on the capital felony counts, and two concurrent ten year terms of imprisonment on the risk of injury to a child counts. The defendant directly appealed from the trial court's judgment to this court pursuant to General Statutes § 51-199 (b) (3).[4] On appeal, the defendant maintains that the trial court improperly: (1) rejected two challenges made pursuant to *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), that the state's reasons for exercising peremptory challenges were pretextual and that the state's real reasons for excluding the venirepersons in question were their race and religion; (2) admitted under the state of mind exception to the hearsay rule an affidavit filed by the defendant's wife in connection with a restraining order she had obtained against him; (3) excluded the defendant's videotaped, hypnotically-induced confessions as too lengthy and self-serving; and (4) instructed the jury on the defense of extreme emotional disturbance by failing to instruct, as the defendant had requested, that the jury must consider his unique mental and emotional characteristics and the impact of those characteristics on his perception

[3] General Statutes (Rev. to 1995) § 53-21, as amended by No. 95-142 of the 1995 Public Acts, provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

[4] General Statutes § 51-199 (b) provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

of the factual circumstances in which he found himself.[5] We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and his wife, Shennavia Brooks (victim), lived in Hartford with their two children, Errol, Jr., who was born in 1990, and Shantalique, who was born in 1993. In 1993, the defendant's marriage began to deteriorate. Mary Shears testified that at one point in 1993, the victim left the defendant and, along with the two children, moved in with Shears. In December, 1993, the victim had the defendant arrested for allegedly attempting to strangle her with an extension cord. According to Anne Marie Cook, the victim's coworker at the department of children and families, the victim would "cower" in the defendant's presence. In the fall of 1995, the victim had told Shears that she was planning on moving into her own apartment and getting divorced. Cook testified that, at that time, she was helping the victim find programs through which she could obtain affordable housing for herself and the children.

On September 29, 1995, the victim applied for and obtained an ex parte restraining order against the defen-

---

[5] The defendant also claimed that the trial court improperly denied his motion in limine regarding the use of his confession, thereby forcing him to choose between his fifth amendment right not to be convicted on the basis of an involuntary confession, and his eighth amendment right to present mitigating evidence. On June 27, 1997, the defendant filed a motion to suppress his confessions to police on the grounds that his statements were involuntary. On January 14, 1999, he filed a motion in limine to preclude the state from using any evidence that he had attempted to suppress any evidence. The motion in limine was denied on September 1, 1999, and, in response to that denial, the defendant withdrew the motion to suppress. On appeal, the defendant argues that the denial of his motion in limine violated his right to due process. We conclude that the defendant waived this claim by his withdrawal of the motion to suppress prior to trial and by his failure to object, at trial, to the admission of his confession. Without the motion to suppress, there is no substantive basis for the motion in limine. The defendant's action of withdrawing the motion to suppress rendered the motion in limine moot. Accordingly, we conclude that any issue for appeal related to this motion has been waived.

dant, claiming that she feared for the safety of herself and her children. On October 27, 1995, she filed a divorce action against him. On November 8, 1995, the defendant was arrested for sexual assault in a spousal or cohabiting relationship. That case was pending and had not yet gone to trial on November 23, 1995.[6]

On November 23, 1995, the defendant, the victim and their children spent much of the day together, celebrating Thanksgiving at the home of the defendant's sister, Sharon James. At approximately 2:30 p.m. that afternoon, the defendant left James' home to attend another Thanksgiving gathering at 39 Grant Street in Hartford, the home of some friends. The defendant's father, aunt and other close friends were present at that gathering, but the victim had not been invited because of the criminal charges she had filed against the defendant. At approximately 9 p.m. that evening, the defendant returned to James' home to pick up the victim and the children and drive them home. James testified that the defendant appeared happy and ate from a plate of food the victim had prepared for him. At 10 p.m. that evening, the defendant drove the victim and the children back to 39 Grant Street in order to pick up his father and take them all home. The defendant left the victim with the children in the car while he went into 39 Grant Street. After approximately one hour, Maureen Grant, one of the guests, testified that she went outside and saw the victim sitting in the defendant's car with the children. Up until this point, no one in the house knew that they were outside. The victim asked Grant to find out if the defendant was coming out soon because their daughter had wet herself and they needed to go home. Another guest, Velora McIntosh Jones, overheard this and went back inside the house to tell the defendant that the victim and the children were waiting for him. He responded to Jones' comments by "hiss[ing]"

---

[6] The state and the defendant stipulated to this fact.

through his teeth and slamming down a bottle of beer. He then went outside, argued with the victim, and retrieved something from the trunk of the car. He placed a locking device on the steering wheel of the car, took the keys out of the ignition, and returned to the house. The victim followed him inside, leaving the children in the car, and asked to use the telephone in order to call a cab to take her and the children home. The defendant then went upstairs and into the bathroom. Grant headed upstairs and the victim followed behind her. The defendant emerged from the upstairs bathroom with a gun in his hand, cursed the victim and shot her five times at point blank range. She was rendered unconscious almost at once and died shortly thereafter. The defendant then went downstairs, out the front door, and proceeded to his car, where he first opened the front passenger door and shot his daughter once in the head, and then opened the rear passenger door and shot his son twice in the head. Both children were rendered unconscious instantaneously and died shortly thereafter.

The defendant reentered the house, pacing back and forth, holding the gun to his head and threatening to kill himself. Grant picked up the telephone to call 911 and found that her husband was already on the telephone, speaking with the 911 dispatcher. She then handed the telephone to the defendant, who told the dispatcher that he had just killed his wife and children. He explained that he shot his wife because she had lied to the police about him. Shortly thereafter, the police arrived at the house, the defendant surrendered his gun and he was taken into custody.

At trial, the defendant asserted the defenses of insanity and extreme emotional disturbance. In support of these defenses, he presented two psychiatrists as expert witnesses. Harold Schwartz testified that the defendant has a personality disorder and that, at the time of the

murders, he suffered from a "major depression with psychotic features . . . marked, predominantly, by hallucinations over an extended period of time, auditory hallucinations, which were telling him to shoot his wife and children." Schwartz testified that he believed that the defendant was overcome by an extreme emotional disturbance that caused him to kill his wife. The defendant then "entered a state of dissociation" in which he was "unaware, consciously, of what he was doing." It was in this dissociative state that he then shot his children. The other defense expert, Howard Zonana, testified that after the defendant had shot his wife, he suffered an extreme emotional reaction and then entered a dissociative state during which he shot and killed his children.

The jury returned a verdict of guilty on each count. This appeal followed.

## I

## *BATSON* CHALLENGES

The defendant claims that the trial court, *Barry, J.*,[7] improperly rejected his *Batson* claims regarding the state's use of peremptory challenges to exclude two potential jurors. The defendant claims the state's proffered reasons for excluding the venirepersons were pretextual and that race and religion were the true reasons for the state's exclusion of those jurors.

In order to review the defendant's *Batson* claims, we follow a well established principle of law. "Peremptory challenges are deeply rooted in our nation's jurisprudence and serve as 'one state-created means to the constitutional end of an impartial jury and a fair trial.' *Georgia* v. *McCollum*, 505 U.S. 42, 57, 112 S. Ct. 2348,

---

[7] Judge Barry presided over jury selection, but fell ill prior to trial. Judge Spada substituted for him and presided over both the trial and the sentencing phases.

120 L. Ed. 2d 33 (1992). Although such challenges generally may be based on subjective as well as objective criteria; see, e.g., *Burks* v. *Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994), cert. denied, 513 U.S. 1160, 115 S. Ct. 1122, 130 L. Ed. 2d 1085 (1995); they may not be used to exclude a prospective juror because of his or her race or gender. *J.E.B.* v. *Alabama ex rel. T.B.*, 511 U.S. 127, 146, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994) (gender); *Batson* v. *Kentucky*, supra, 476 U.S. 89 (race)." *State* v. *Hodge*, 248 Conn. 207, 217, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).

"In *Batson* . . . the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her

particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubts raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 283–86, 750 A.2d 1059 (2000).

We consider each of the defendant's *Batson* claims in turn.

A

Venireperson J.R.[8]

J.R. was born in Jamaica and moved to this country in 1983, at the age of seventeen. She testified that she is employed at the state department of social services, counseling clients about welfare benefits. At the conclusion of her examination, the state exercised a peremptory challenge to excuse her. When asked to provide a race neutral explanation for removing J.R. from the panel, the state offered the following reasons: (1) J.R. was extremely concerned about her work; specifically, that her absence would cause a backlog of client appointments that either her coworkers would have to take care of or she would have to reschedule; (2) J.R. was distracted by the imminent scheduling of the clos-

---

[8] We use the initials of each venireperson in order to protect that venireperson's legitimate privacy interests.

ing on a house she was purchasing and worried that she would have to move out of her current home while serving on the jury; (3) J.R. expressed ambivalent feelings about the death penalty; she first suggested that she would need to ask her pastor about the church's position on the death penalty so that she could abide by the church's teachings on the subject; she then indicated that she would be able to follow the court's instructions on the law regarding the death penalty irrespective of the church's stand but that, overall, she did not want to "have a person's life . . . in [her] hands"; and (4) J.R. indicated she would have trouble remaining impartial if the evidence in the case was very gruesome.

The defendant countered that the state's challenge was motivated by improper racial and religious considerations. The defendant claims the state's proffered reasons were pretextual because other jurors shared at least one of the negative characteristics that the state attributed to J.R.[9] G.F. had expressed ambivalence about the death penalty and its relation to his religious beliefs, but responded affirmatively when asked if he could follow the trial court's instructions. C.J. was "shocked" when she learned that the case potentially involved the death penalty. She testified, however, that she felt she would be able to participate in a process that could result in the death penalty. M.O. was horrified by the allegations involving the children, testifying that she found it "inexcusable" that children were involved, but indicated to both the state and the defense that she would be able to follow the law as instructed. Y.B. had

[9] On appeal, the defendant argues that one juror shared all of the negative characteristics attributed to J.R. That argument, however, was not raised at the trial level and, therefore, is not reviewable. "[B]ecause a claim of purposeful discrimination under *Batson* raises issues of fact to be decided by the trial court, the moving party's failure to inform the trial court of the full factual basis for the claim renders that claim unreviewable." (Internal quotation marks omitted.) *State* v. *Mukhtaar*, supra, 253 Conn. 290.

indicated on the questionnaire that she worried about the time commitment entailed with being a juror, but those concerns were addressed and resolved during the voir dire questioning. C.W. also indicated concerns about her work schedule, but the defendant again conceded these may have been resolved during questioning. A.D. expressed discomfort with the idea of "[s]itting in judgment" at the guilt phase of the proceedings, but claimed she would follow the law despite her reservations. C.L. said he was concerned about being absent from his job, but explained that his work would be covered and that there would be no risk of losing his job.

We agree with the state that the record supports the trial court's conclusion that the reasons offered by the state for excluding J.R. from the jury panel were not pretextual. The fact that there may be similarities between J.R. and other venirepersons of different races and religions who were not excluded is not sufficient by itself to prove that the reasons proffered for the exclusion were pretextual. Although the defendant observed that venirepersons of other races and religions shared some similar characteristics with J.R., "the failure to strike a white juror who shares *some* traits with a struck black juror does not itself automatically prove the existence of discrimination." (Emphasis in original; internal quotation marks omitted.) *State* v. *Hodge,* supra, 248 Conn. 237. In *Hodge,* we found that venirepersons sharing similar characteristics with the excluded venireperson were distinguishable from the excluded venireperson in ways that obviated the negativity of the shared characteristic and enhanced the desirability of those venirepersons for jury selection. There, the excluded juror had limited formal education; the state accepted a white juror with limited formal education who also had owned and operated his own business for many years, thereby demonstrating maturity and a sense of responsibility. Id. Furthermore, the

white juror had indicated an extensive knowledge about firearms, a fact that was relevant to that case. Id. We concluded that because of these additional characteristics, "the state had strong reason to select [the accepted venireperson] notwithstanding his limited formal education. The same cannot be said for [the excluded venireperson]." Id.

Analyzing the characteristics of the accepted venirepersons in the present case, as revealed in the record before us, we conclude that each of them possessed characteristics that made them attractive for jury selection and that outweighed the possible negative quality of the trait they might have shared with J.R. G.F. had indicated that he would follow the court's instructions despite any religious teachings; C.J. expressed willingness to participate in a capital case; M.O. said she would follow the court's instructions regardless of her shock at the crimes alleged; Y.B.'s work concerns were allayed during voir dire; C.W. clarified that being a juror would not cause her hardship; A.D. indicated she would follow the court's instructions despite any personal misgivings; and C.L. said there would be no problem regarding his job. We conclude that the state had strong reasons to select the venirepersons it did accept, notwithstanding some of the characteristics they might have shared with J.R.

The defendant also argues that the state improperly excluded J.R. because of her religious affiliation. We disagree. J.R.'s expressed religious *beliefs* indicated that she would be unsuitable as a juror. She said that she was not certain what her church's position was on the death penalty, and that she would like to consult with her pastor about that issue. Although she later said she would be able to follow the law regardless of her church's position, she said she did not want to "have a person's life . . . in [her] hands."

We previously have concluded that the equal protection clause of the fourteenth amendment to the United States constitution prohibits the exercise of a peremptory challenge to excuse a venireperson because of his or her religious affiliation. *State* v. *Hodge,* supra, 248 Conn. 240. An individual's religious *beliefs,* however, may hinder that individual's ability to serve impartially on a particular case. "Although one's religious *beliefs* may render a prospective juror unsuitable for service in a particular case, one's religious *affiliation,* like one's race or gender, bears no relation to that person's ability to serve as a juror." (Emphasis in original.) Id., 245; see *Georgia* v. *McCollum,* supra, 505 U.S. 59 ("[i]n our heterogeneous society policy as well as constitutional considerations militate against the divisive assumption—as a per se rule—that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion" [internal quotation marks omitted]). The state's attorney properly questioned J.R. about her religious beliefs and explored the ways in which they might interfere with her ability to serve impartially on the case and to follow the court's instructions. Because the state's questioning did not focus solely on J.R.'s religious affiliation, we conclude that the trial court permissibly accepted the state's peremptory challenge to J.R.

### B

### Venireperson R.R.

R.R. testified that she works for the state judicial department as a data terminal operator in the small claims department of geographical area number twelve in Manchester. She indicated that she had been raised as a Catholic until she was five or six years old, and that she was presently studying to become a Jehovah's Witness. When questioned, R.R. indicated that she did not know the teachings of the Jehovah's Witnesses

regarding the death penalty, but did say that she might be influenced if she learned that they were opposed to it. She testified that she would be able to accept and follow the court's instructions regarding the law, but then admitted that her ability to participate in the penalty hearing would be conditioned on the teachings of her religion. The state moved to excuse R.R. for cause, based on her expressed unwillingness to follow the law if it was in conflict with her religious beliefs. The trial court denied this motion. The state then exercised a peremptory challenge, specifying that "the reason is the influence that her religion might have on her ability to follow the law," and citing *State* v. *Hodge*, supra, 248 Conn. 245, for support of its position. The defendant now argues that this was an improper exclusion based on R.R.'s religious affiliation. We disagree with the defendant.

Again, we conclude that the trial court properly rejected the defendant's *Batson* claim. The record reveals to our satisfaction that the state did not excuse R.R. because she was a Jehovah's Witness, but because her religious beliefs reasonably may have adversely impacted her ability to serve as an impartial juror in a death penalty case.

## II

### ADMISSIBILITY OF AFFIDAVIT

On September 29, 1995, the victim filed an affidavit in support of her request for an ex parte restraining order against the defendant. During its case-in-chief, the state proffered a certified copy of that request and the affidavit as evidence of the victim's state of mind on September 29, 1995, claiming that her state of mind was relevant to show the deterioration of the couple's marriage, to establish the defendant's motive for murder, and to rebut his defense of extreme emotional disturbance. The defendant objected to the admission

of the affidavit on the grounds that it contained statements of inadmissible hearsay and that its admission violated the defendant's constitutional rights as provided by the sixth and fourteenth amendments to the United States constitution and by article first, § 8, of the constitution of Connecticut.[10] On appeal, the defendant, inter alia, renews these objections and argues that the affidavit improperly was admitted. Our conclusion regarding the admission of the affidavit is twofold. First, the sentence by the victim stating, "I fear for the safety of the lives of me [and] my children," was a direct expression of the victim's state of mind and, thus, properly was admissible under the hearsay exception to prove the truth of that statement. Second, the remainder of the affidavit improperly was admitted because it did not satisfy the hearsay state of mind exception, nor did it prove circumstantially the victim's state of mind. Its erroneous admission, however, was harmless because it was cumulative of other properly admitted evidence of the defendant's deteriorating relationship with the victim. Accordingly, we affirm the judgment of the trial court.

The following additional facts are necessary in order to assess the defendant's claim. In response to the defendant's objections to the admissibility of the proffered affidavit, the trial court gave a limiting instruction, informing the jury that the affidavit was to be considered only for the state of mind of the affiant, the victim,

---

[10] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The constitution of Connecticut, article first, § 8, provides in relevant part: "In all criminal prosecutions, the accused shall have the right . . . to be confronted by the witnesses against him . . . ."

and not for the truth of the matters therein asserted.[11] The clerk then read the affidavit into the record. In the affidavit, the victim stated: "I am physically abused at least once a month and verbally abused daily. [September 28, 1995], last night, after forcing sex on me, he started bothering me squeezing my fingers. When I pushed him off, he claimed I started bothering him. I fear for the safety of the lives of me [and] my children. Last night he said he would kill me if I did not stop bothering him which I was actually defending myself. At least once a month, my husband starts fights with me. On [December, 1993], I had him arrested for strangling me with an extension cord. Since then he has stated several times that I cannot move out and if I try he will kidnap my kids and if I ever call the police on him again, he will kill me. Last night he stated several

---

[11] The court instructed the jury as follows: "Now, ladies and gentlemen, you heard testimony that a portion of exhibit sixty-one coming to you is entitled 'An Affidavit Relief from Abuse' and that it was signed by [the victim] and her signature was subscribed to and sworn before either a clerk or a notary of the public of the civil court across the street.

"Now, there are approximately ten or eleven lines that will be read to you. This is what is important for you to note and to remember because [the victim] is not present in court and is not giving you this testimony under oath before you so she can be cross-examined. But there are certain exceptions to our rules of evidence, and one of them appears to be in control on this situation. This evidence is coming to you so that you may use it in a circumstantial fashion to determine [the victim's] state of mind on September 29, 1995.

"Now, all of us know from our own experiences that we have states of mind on certain matters that we confront or intersect through life that may or may not over a passage of time be based on accurate [predictions], accurate suppositions. So this is not coming to you for the truth of testimony as other witnesses have been presented to you and will be presented to you. They will testify under oath and whether you accept it or reject it [it] is your responsibility and your right, but at least it's being presented to you for you to accept as truth. If you want to reject it, you are free to reject it. This is not being presented to you for that purpose, not being presented for the truth of what you will hear momentarily. It's only being presented to circumstantially establish [the victim's] state of mind on September 29, 1995."

times that I was stupid for fighting him because I should know by now that he can kill me."

Thereafter, the court instructed the jury once again: "I just want to underscore again. . . . You must always be cautioned that the statements signed onto in this affidavit by [the victim] are not being presented to you for purposes of your accepting them as truthful in whole or in part. They're being presented to you to show [the victim's] state of mind on September 29, 1995. That's it."

The defendant argues that the affidavit improperly was admitted because the alleged events that caused the victim's fear of the defendant and her belief that he intended to kill her and her children were actually statements of alleged prior misconduct by the defendant and would be used for their truth. The admission of statements of these alleged acts of misconduct, he argues, violated his right to confrontation because he could not cross-examine the victim to prove to the jury that the alleged events had not occurred. The defendant also argues that even if the affidavit was admissible as nonhearsay evidence proving circumstantially the victim's state of mind, portions of it nonetheless should have been excluded because their prejudicial effect far outweighed their probative value. While we agree with the defendant that portions of the affidavit improperly were admitted, we further conclude that the prejudicial effect of that evidence did not outweigh its probative value and, accordingly, we conclude that the admission of the affidavit, in its entirety, constituted harmless error.

Our analysis is based on well established principles of law. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a show-

ing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Citation omitted; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998).[12]

At trial, there was more than ample evidence, presented through the testimony of eyewitnesses, that the defendant shot and killed the victim and the children. It is important to note at the outset, therefore, that the central issue in the present case was the extent to which the defendant was culpable for his homicidal acts. In order to make that determination, the jury had to consider evidence of the defendant's possible motives, as well as assess the nature of the defendant's relationships with the victim and the children and consider the defense of extreme emotional disturbance. Consequently, the state offered the affidavit as circumstantial evidence of the victim's state of mind, to reflect the nature of the relationship between the victim and the defendant and to undermine his defense.

The rules of evidence relating to this issue are well established. "[A]n out-of-court statement that is offered to establish the truth of the matter asserted is inadmissible hearsay unless the statement falls within a recognized exception to the hearsay rule." *State* v. *Wargo*, 255 Conn. 113, 137–38, 763 A.2d 1 (2000). One such

---

[12] Our conclusion that portions of the affidavit were inadmissible raises an evidentiary issue only. We do not find that the defendant's constitutional rights are implicated. We adhere, therefore, to the standard of review governing evidentiary claims. If it was a constitutional issue, the standard would be different; namely, the state would have the burden of proving the constitutional error was harmless beyond a reasonable doubt. *State* v. *Spillane*, 255 Conn. 746, 756–57, 770 A.2d 898 (2001).

exception provides that statements expressing a declarant's present state of mind may be offered for the truth of the matter asserted, if relevant. See Conn. Code Evid. § 8-3 (4);[13] see also 6 J. Wigmore, Evidence (Chadbourn Rev. 1976) § 1715, p. 99 ("direct assertions of the state of mind [such as] 'I know that I am ill,' [and] 'I did not intend to injure Doe,' " are hearsay and must satisfy state of mind exception to rule to be admissible). The victim's statement, "I fear for the safety of the lives of me [and] my children," was a direct expression of her present state of mind. Accordingly, it properly was admissible under the hearsay exception to prove the truth of that statement. See 2 C. McCormick, Evidence (4th Ed. 1992) § 276, p. 243 (statement " 'I am afraid of D' [presents] no hearsay problem").

"We previously have held that evidence of a victim's mental state may be relevant to establish the defendant's motive to kill the victim. See, e.g., State v. Hull, 210 Conn. 481, 501–502, 556 A.2d 154 (1989) ('[t]he victim's mental state was relevant both to show the victim's fear of the defendant . . . and to establish the defendant's motive for committing the crime' . . .); State v. Thomas, 205 Conn. 279, 285, 533 A.2d 553 (1987) ('The trial court correctly determined that [the victim's expression of fear of the defendant] was reliable circumstantial evidence of a deteriorated relationship. As such, it was relevant and probative because it tended

[13] The exception to the hearsay rule contained in § 8-3 (4) of the Connecticut Code of Evidence provides: "A statement of the declarant's then-existing mental or emotional condition, including a statement indicating a present intention to do a particular act in the immediate future, provided that the statement is a natural expression of the condition and is not a statement of memory or belief to prove the fact remembered or believed." The federal rule of evidence pertaining to the state of mind hearsay exception; Fed. R. Evid. 803 (3); mirrors the Connecticut rule, save for an exception to the prohibition on proof of facts remembered or believed for wills. C. Tait, Connecticut Evidence (3d Ed. 2001) § 8.19.2, p. 625. Federal case law is instructive, therefore, on this issue.

to support the state's claim that the relationship [between the victim and the defendant] had broken down, and from that circumstance the jury could infer motive.').'' *State* v. *Wargo*, supra, 255 Conn. 138.

In this case, the victim's statement regarding her fearful state of mind was particularly relevant in light of the defendant's theory of defense. "A defendant's articulated or implied theory of defense may make the victim's state of mind material to the determination of the defendant's guilt or innocence." *State* v. *Crafts*, 226 Conn. 237, 253–54, 627 A.2d 877 (1993).[14] In *State* v. *Blades*, 225 Conn. 609, 635, 626 A.2d 273 (1993), "[w]e [were] persuaded that the assertion of the defendant's extreme emotional disturbance defense put the victim's state of mind into issue." Accordingly, evidence of the victim's state of mind was deemed admissible. Id. In the present case, as well, evidence that the marriage of the victim and the defendant had deteriorated and that she had expressed fear of him for herself and for the children contradicted the defendant's theory that the couple had reconciled and that the murders were solely the result of his mental condition and reaction to the specific circumstances of November 23, 1995.

The defendant argues that, even if this evidence were admissible, it should have been excluded because its prejudicial impact outweighed its probative value. We disagree. "Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to

[14] As noted, the necessary determination in the present case was not whether the defendant killed the victim and the children. On the basis of the evidence at trial, no reasonable jury could find the defendant innocent of killing them. What was at issue, rather, was the defendant's culpability for those acts. We conclude that the rationale we adopted in *Crafts*, namely, that the theory of defense may make the victim's state of mind material, is equally relevant here.

one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . *State* v. *Copas*, 252 Conn. 318, 329–30, 746 A.2d 761 (2000)." (Internal quotation marks omitted.) *State* v. *Wargo*, supra, 255 Conn. 141–42.

We acknowledge the heightened potential for prejudice in cases such as this, in which the evidence considered is from the voice of the victim. "As we have recognized, a real risk of prejudice exists in allowing surrogates to speak for the victim pointing back from the grave. . . . *State* v. *Crafts*, supra, 226 Conn. 255. Because of that risk, trial courts must take special care in evaluating the relevance of such evidence and in weighing its probative value and prejudicial effect." (Internal quotation marks omitted.) *State* v. *Wargo*, supra, 255 Conn. 142.

In light of the other evidence of the defendant's violent and emotional nature, the victim's statement, "I fear for the safety of the lives of me [and] my children," cannot reasonably be characterized as unfairly prejudicial. Furthermore, the limiting instructions provided by

the trial court sufficiently safeguarded the jury from the possible misuse of this evidence.

The remaining portion of the affidavit, however, improperly was admitted. Every other statement contained in the victim's affidavit referred not directly to her state of mind, but rather to specific acts of alleged prior misconduct by the defendant. The state of mind hearsay exception excludes such statements because they are "statement[s] of memory or belief to prove the fact remembered or believed." Conn. Code Evid. § 8-3 (4). "Th[is] exclusion . . . is necessary to prevent the exception from swallowing the hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." *United States* v. *Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991); see also *United States* v. *Hernandez*, 176 F.3d 719, 727 (3d Cir. 1999) ("scope of this exception must be limited to prevent it from devouring the rule"). Accordingly, while courts may admit evidence of direct expressions of a declarant's fear of a defendant, they generally do not permit statements as to the *cause* of that fear. See, e.g., *United States* v. *Joe*, 8 F.3d 1488, 1492–93 (10th Cir. 1993), cert. denied, 510 U.S. 1184, 114 S. Ct. 1236, 127 L. Ed. 2d 579 (1994); *United States* v. *Liu*, 960 F.2d 449, 452 (5th Cir.), cert. denied sub nom. *Ai-Ti Ting* v. *United States*, 506 U.S. 957, 113 S. Ct. 418, 121 L. Ed. 2d 341 (1992); *United States* v. *Emmert*, 829 F.2d 805, 810 (9th Cir. 1987); *United States* v. *Brown*, 490 F.2d 758, 781 (D.C. Cir. 1973); see also 2 C. McCormick, supra, § 276, p. 244 (explaining that even statements of fear unconnected to specific allegations are fraught with evidentiary problems).

In the present case, the state attempts to circumvent the prohibition on statements pointing to acts of another as the cause of the declarant's state of mind by claiming that the affidavit was offered to prove *cir-*

*cumstantially* the victim's state of mind regarding her fear of the defendant and their deteriorating relationship. We have recognized that "a[n] out-of-court statement is not hearsay . . . if it is offered to illustrate circumstantially the declarant's then present state of mind, rather than to prove the truth of the matter asserted." (Internal quotation marks omitted.) *State* v. *Wargo*, supra, 255 Conn. 138; accord *State* v. *Blades*, supra, 225 Conn. 632. We have also stated, however, that "the out-of-court statement must be offered *exclusively* as evidence of the declarant's state of mind." (Emphasis added.) *State* v. *Bova*, 240 Conn. 210, 238, 690 A.2d 1370 (1997).

It is evident, however, that the value of the statements in the present case did not lay in demonstrating that the victim feared the defendant and that her marriage had deteriorated—points that readily were demonstrated by the facts that the victim had sought the restraining order, filed for divorce, and looked for new housing. Instead, the *real* value of the statements lay in their use to demonstrate that the victim's fear was reasonable and indeed objectively justified because the statements regarding the defendant's threats and prior acts of violence were true. The likelihood of this improper use was underscored by the trial court's comments, out of the presence of the jury, in ruling on the admissibility of the statements: "We're talking fear and what caused the fear. That comes in as hearsay to show circumstantially the victim's apprehension and [her] state of mind. In this instance, she twice predicts he's going to kill her. She's a pretty good prophet."

While the state's proffered rationale for the admission of the affidavit is consistent with our prior case law; see *State* v. *Wargo*, supra, 255 Conn. 136–37 (relevant to deteriorating relationship); *State* v. *Blades*, supra, 225 Conn. 631–33 (relevant to victim's fear of defendant); *State* v. *Hull*, supra, 210 Conn. 502 (same); *State* v.

*Thomas*, supra, 205 Conn. 285 (relevant to deteriorating relationship); see also *State* v. *Crafts*, supra, 226 Conn. 254 (relevant to whether victim was dead rather than missing or hiding); we disagree with the state that these cases support the admissibility of the affidavit in the present case. In these cases, we concluded that a victim's statements were admissible to show her then existing state of mind regarding her deteriorating relationship with, or fear of, the defendant. In no instance have we concluded that statements regarding past *conduct by the defendant* were admissible to prove circumstantially the victim's state of mind.

For example, we have affirmed the admission of statements that circumstantially reflect the victim's *subjective* state of mind.[15] See *State* v. *Crafts*, supra, 226 Conn. 252; *State* v. *Blades*, supra, 225 Conn. 630–31; *State* v. *Hull*, supra, 210 Conn. 502. Importantly, however, the statements at issue in those cases did not indicate that the victim's state of mind was dependent on specific, prior violent acts by the defendant, which thereby rendered that state of mind well founded. In *Crafts* and *Blades*, for example, witnesses had testified, in essence, that the victim in each case had told them that, if something were to happen to her, they should

---

[15] We also have concluded that nonassertive conduct is admissible to prove circumstantially a victim's state of mind. For example, in *State* v. *Thomas*, supra, 205 Conn. 284, witnesses testified that the victim had tried to hide when told that the defendant was at the door and that, following an argument between the defendant and the victim, the victim's daughter had been trembling and afraid. In concluding that the testimony properly was admitted to prove state of mind, we explained that "[n]onassertive conduct such as running to hide, or shaking and trembling, is not hearsay. *State* v. *McCarthy*, 197 Conn. 166, 173, 496 A.2d 190 (1985)." *State* v. *Thomas*, supra, 285. Likewise, in *State* v. *Blades*, supra, 225 Conn. 633, we concluded that a witness' testimony that the victim had an ice pick in her purse "concerned a nonassertive act of the victim that tended to show her fear of the defendant." Accordingly, in those cases, there was no issue as to whether the jury could use the evidence for an improper hearsay use, as in the present case.

not believe that it was an accident, but rather that her husband was responsible. *State* v. *Crafts*, supra, 252; *State* v. *Blades*, supra, 630–31. The victim in each of those cases did not say why she believed this to be true. Accordingly, the statements reflected the victim's subjective belief that the defendant would harm her, not that her fear necessarily was predicated on specific acts by the defendant, which, if believed, would have made the victim's fear objectively reasonable.

In *State* v. *Wargo*, supra, 255 Conn. 137, we concluded that a witness properly testified to a victim's statement regarding a prior act of or threat of violence by the defendant. In that case, one of the victim's statements to which the witness had testified was the victim's declaration that the defendant had slammed her up against a wall and had threatened to kill her. Id., 136. Although this statement clearly implicates the same concern as the one raised by the statements in the present affidavit, namely, that the jury would use the statements for their truth, we never addressed in *Wargo* the circumstantial state of mind versus hearsay issue because the defendant challenged only the *relevancy* of those statements. Id., 138. It is noteworthy, however, that, in *Wargo*, the witness also properly had testified that the defendant had admitted doing precisely what the victim had claimed.[16] Id., 134–35. Therefore, in that case, the truth of the victim's statement was uncontested. Accordingly, our case law cannot be read to sanction the admission of the statements in the affidavit regarding the defendant's alleged past conduct as circumstantial evidence of the victim's state of mind.

According to the state's reasoning, *any* statements by a victim regarding a defendant's prior acts of or

[16] Although not addressed specifically in *Wargo*, it is well established that a defendant's own statements are admissible for their truth as an admission of a party opponent. Conn. Code Evid. § 8-3 (1) (A); see also *State* v. *Gaston*, 198 Conn. 490, 495 n.2, 503 A.2d 1157 (1986); *State* v. *DeMatteo*, 186 Conn. 696, 702, 443 A.2d 915 (1982).

threats of violence could be admitted when being offered to prove the victim's state of mind. It is well established, however, that such use is improper. See *Shepard* v. *United States*, 290 U.S. 96, 54 S. Ct. 22, 78 L. Ed. 196 (1933);[17] see also *People* v. *Lew*, 68 Cal. 2d 774, 780, 441 P.2d 942, 69 Cal. Rptr. 102 (1968) (victim's statements, including alleged threats by defendant, relevant but inadmissible because they implied past misconduct by defendant and " 'to try and separate state of mind from the truth of the charges is an almost impossible task' "). In essence, the state attempts to circumvent the prohibition on "a statement of memory or belief to prove the fact remembered or believed"; Conn. Code Evid. § 8-3 (4); by permitting through the back door of circumstantial evidence what could not properly be admitted through the front door of hearsay. Accordingly, we conclude that the victim's affidavit, exclusive of the statement, "I fear for the safety of the lives of me [and] my children," improperly was admitted as circumstantial state of mind evidence.

Because we conclude that the trial court improperly admitted the majority of the affidavit, it is necessary

---

[17] *Shepard* v. *United States*, supra, 290 U.S. 96, illustrates both the application of, and the rationale for, the distinction between statements to prove the victim's state of mind and statements to prove the truth of the act giving rise to the state of mind. In that case, the United States Supreme Court concluded that a victim's statement that her husband had poisoned her was inadmissible to rebut the defendant's contention that his wife was suicidal. Id., 104–106. The court rejected the notion that the jury would use the evidence as proof of the victim's state of mind, rather than for the truth of the accusation. Id., 104. Justice Cardoza, writing for the court, explained: "It will not do to say that the jury might accept the declarations for any light that they cast upon the existence of a vital urge, and reject them to the extent that they charged the death to some one else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed." Id. The court recognized that, although there are instances when state of mind properly may be proved, the victim's statements in that case could not so be used, because they "spoke to a past act, and more than that, to an act by [someone other than] the speaker." Id., 106.

for us to assess any harm caused by the admission. "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. . . . One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Young*, 258 Conn. 79, 94–95, 779 A.2d 112 (2001). We conclude that the defendant here has not demonstrated harm pursuant to either standard.

"It is well recognized that any error in the admission of evidence does not require reversal of the resulting judgment if the improperly admitted evidence is merely cumulative of other validly admitted testimony." (Internal quotation marks omitted.) *Fink* v. *Golenbock*, 238 Conn. 183, 211, 680 A.2d 1243 (1996). The improperly admitted portion of the affidavit was not so harmful as to either affect the result of the trial or to undermine confidence in the fairness of the verdict. The allegations of the defendant's past acts are merely cumulative of other, properly admitted evidence about the deteriorating relationship between the defendant and the victim and the defendant's violent tendencies. As noted, the state had presented evidence about the restraining order, the pending divorce action, the pending charges of sexual assault filed by the victim against the defendant, and the testimony of witnesses who stated that they assisted the victim in her search for alternate living arrangements and who had observed the victim and the defendant together. Importantly, defense counsel began

his closing argument by conceding that the defendant had a violent relationship with the victim. Additionally, the defendant's expert witnesses testified that the defendant had been violent toward the victim. Because the jury was privy to this other evidence establishing the same facts, it is not reasonable to conclude that the affidavit affected the verdict. The error in its admission, therefore, is harmless.

## III

## EXCLUSION OF HYPNOTICALLY-INDUCED VIDEOTAPED CONFESSIONS

The defendant claims that the trial court improperly excluded sixteen hours of videotaped sessions with Zonana. Approximately 10 to 15 percent of the sixteen hours was spent using hypnosis. During these sessions, Zonana hypnotized the defendant in order to elicit and clarify his memories about the shootings. The balance of time was spent interviewing the defendant about what he remembered before the hypnosis, reviewing with the defendant what was revealed during the hypnosis, and conducting a complete and full psychiatric evaluation of the defendant. As a result of these sessions, Zonana concluded that the defendant was not suffering from any mental disease or defect at the time he shot his wife, but that, due to that event, he experienced an extreme emotional disturbance during which time he shot and killed his children. The videotaped sessions were offered into evidence twice: first, during Zonana's direct examination, as the basis of his opinion, and second, after Zonana's redirect examination, to rebut portions of the state's cross-examination. The trial court denied both proffers, explaining that the videotapes were too lengthy to view in their entirety, that they contained many self-serving statements, and that they would constitute the defendant testifying without being subject to cross-examination. The court also explained

that the viewing of the videotapes was not necessary for the defense because Zonana had been permitted to review them and had recounted as much of their content as he had deemed necessary. The defendant now objects to this exclusion, claiming that this ruling violated his constitutional right to present a defense. We disagree with the defendant.

"The sixth amendment right to compulsory process includes the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . . A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes." (Citation omitted; internal quotation marks omitted.) *State* v. *King*, 249 Conn. 645, 668, 735 A.2d 267 (1999).

We state once more that "[t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) Id., 669.

We conclude that the defendant's constitutional right to present a defense was not violated. The videotapes,

in fact, would be merely cumulative of what was already before the jury. The defendant had the opportunity to present his defense, utilizing the content of the video-taped sessions. Zonana testified extensively about the videotaped sessions, describing the defendant's demeanor, the content of the sessions, and providing his expert assessment of the information gleaned therein. Schwartz also viewed the videotapes and used them as an aid in his evaluation of the defendant's integrity and mental condition. The trial court did not limit or restrict the scope of either expert's testimony regarding the videotaped sessions. We conclude, therefore, that the trial court's exclusion of the videotapes was not an error of constitutional dimensions.

Furthermore, the trial court expressed concern that the admission of the videotapes would constitute putting the defendant's testimony before the jury without affording the state the right to cross-examine him.[18] We agree. As the Appellate Court has observed, "[t]o allow [the defendant] to make declarations in support of his cause and then to give those declarations in evidence would, in effect . . . allow him to make evidence in his favor at his pleasure." (Internal quotation marks omitted.) *State* v. *Brown*, 22 Conn. App. 521, 524, 577 A.2d 1120, cert. denied, 216 Conn. 825, 582 A.2d 204 (1990). "The attempt to introduce the tape [of the hypno-

---

[18] The trial court stated: "[The videotaped evidence] is totally tainted by [the defendant's] self-serving statements and his pronouncements orally that go unattacked, unrebutted, unrefuted, which advances his position that he was—he lacked capacity at the time of the shootings. You clearly are not prejudiced because you have your witness here. You have the witness who architected the hypnosis and the interviews. You have the witness who can respond to any number of questions as to what he asked the defendant. And you have a witness [who has] testified now, excessively, as to the voices, the hallucinations, the psychoses, coupled with the depressions. So there is no prejudice to the . . . defendant. . . . I also concluded that the tapes in and of themselves possessed [an] excessive amount of self-serving statements that should not go to the jury if he's not going to take the witness stand and be cross-examined."

sis sessions] essentially amounted to an effort to put the defendant's testimony directly before the jury without subjecting him to the cross-examination and impeachment that would have followed had he taken the witness stand." *United States* v. *McCollum*, 732 F.2d 1419, 1423 (9th Cir.), cert. denied, 469 U.S. 920, 105 S. Ct. 301, 83 L. Ed. 2d 236 (1984). We conclude that the trial court properly excluded the videotapes for this reason.

## IV

## INSTRUCTION ON EXTREME EMOTIONAL DISTURBANCE

The defendant claims that the trial court improperly instructed the jury on the defense of extreme emotional disturbance because the trial court failed to include, in accordance with his request, the charge that the jury must consider not only the factual situation in which the defendant found himself, but also his unique mental and emotional characteristics and the impact of those factors on his perception of the circumstances. The defendant contends that the reasonableness of the explanation or excuse must be assessed from his particular perspective, not from the perspective of the reasonable person. We disagree.

"Our review of the defendant's claim requires that we examine the court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal." (Citations omitted.) *State* v. *Ortiz*, 217 Conn. 648, 661–62, 588 A.2d 127 (1991). "As long

as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Faria*, 254 Conn. 613, 634, 758 A.2d 348 (2000).

Section 53a-54a (a) provides in relevant part that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ." The trial court instructed the jury that "[e]xtreme emotional disturbance is composed of the following three criteria that must be proven by the defendant by a preponderance of the evidence: (1) that at the time the defendant intentionally caused the death of [the victim], he acted under the influence of an emotional disturbance; (2) that such emotional disturbance was extreme; and (3) that under all the circumstances, as the defendant believed them to be, there was a reasonable explanation or excuse for such extreme emotional disturbance influencing his conduct. . . . You must measure the reasonableness from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be. The reasonableness standard is applied to determine the reasonableness of the explanation for the killing and not the reasonableness of the killing itself." The defendant had requested that the trial court include the following elaboration to the instruction: "First, you must determine what the circumstances were which [the defendant] believed existed. Second, you must

determine whether in [the defendant's] situation and considering the circumstances as he believed them to exist, his explanation or excuse for the emotional disturbance was reasonable. The phrase 'in [the defendant's] situation' requires that you consider not only the factual situation in which [the defendant] found himself, but his unique mental and emotional characteristics and the impact of those factors on his perception of the circumstances. Taking those factors into consideration was the explanation or excuse for his emotional disturbance objectively reasonable?"

"In *State* v. *Ortiz*, [supra, 217 Conn. 652–53], we rejected a virtually identical challenge to such an instruction. In *Ortiz*, the defendant claimed that § 53a-54a (a) required an instruction that the jury must consider the reasonableness of the explanation or excuse as determined from the *defendant's* viewpoint rather than from the viewpoint of a reasonable person in the defendant's situation under the circumstances as he believed them to be. Relying on our decision in *State* v. *Elliott*, 177 Conn. 1, 411 A.2d 3 (1979), we concluded that the legislature intended to establish a standard that is objective in its overview, but subjective as to the defendant's belief; id. [7]; and, with regard to the objective element contained in the statute, [we stated] that the reasonable man yardstick is only used to determine the reasonableness of the explanation or excuse of the action of the defendant from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be. *State* v. *Ortiz*, supra, 653." (Emphasis in original; internal quotation marks omitted.) *State* v. *Raguseo*, 225 Conn. 114, 127, 622 A.2d 519 (1993).

In the present case, as in both *Raguseo* and *Ortiz*, the defendant's proposed instruction would "eviscerate the element of objectivity that the drafters [of the Model Penal Code] intended to preserve, and would make the

inquiry entirely subjective." (Internal quotation marks omitted.) Id. Section 53a-54a (a), which is modeled after § 201.3 (1) (b) of the Model Penal Code, contemplates the trier of fact utilizing an objectively reasonable perspective in order to assess the defendant's subjective experience. "[T]he drafters state that although § 201.3 (1) (b) was intended to embody a larger element of subjectivity than the common law heat of passion defense, it is only the actor's situation and the circumstances as he believed them to be, not his scheme of moral values, that are thus to be considered. . . . Model Penal Code § 201.3 (1) (b), comment, p. 41 (Tent. Draft No. 9 1959). If the reasonableness of the explanation or excuse for a defendant's extreme emotional disturbance were determined by ascertaining whether the disturbance was reasonable to him, his subjective scheme of moral values would become a consideration in the reasonableness inquiry, a result plainly not intended by the drafters. Such an approach would also eliminate the barrier against debilitating individualization of the standard that the drafters intended to create by requiring that the explanation or excuse for a defendant's extreme emotional disturbance be reasonable. Model Penal Code, revised comments, p. 62 (Official Draft 1962)." (Internal quotation marks omitted.) *State* v. *Ortiz*, supra, 217 Conn. 656–57. The trial court's instructions properly conveyed this tension between subjectivity and objectivity. Accordingly, we find that the trial court's instructions were proper.

The judgment is affirmed.

In this opinion the other justices concurred.