## JAMES FRIEDMAN *v.* MERIDEN ORTHOPAEDIC GROUP, P.C., ET AL.
### (AC 21841)

Lavery, C. J., and Dranginis and Flynn, Js.

Argued October 28, 2002—officially released June 10, 2003

*Joel T. Faxon*, with whom was *Carey B. Reilly*, for the appellant (plaintiff).

*David J. Robertson*, with whom, on the brief, were *Madonna A. Sacco* and *Catherine L. Creager*, for the appellees (named defendant et al.).

*Opinion*

FLYNN, J. In this medical malpractice action, the plaintiff, James Friedman, appeals from the judgment of the trial court, rendered after a jury verdict for the defendants Meriden Orthopaedic Group, P.C., and Paul Zimmering, a surgeon who was employed by the defendant corporation. Specifically, the plaintiff claims that the court improperly found that he failed to lay an adequate foundation to admit the portion of the deposition testimony of a board certified neuroradiologist regarding the standard of care applicable to an orthopedic surgeon. We affirm the judgment of the trial court.

The following facts are relevant to this appeal. The plaintiff injured his lower back during a football game sometime in October, 1992. The plaintiff consulted Zimmering, a board certified orthopedic surgeon, who diagnosed the plaintiff as having a herniated disc, which Zimmering recommended be surgically removed. The plaintiff agreed. When the plaintiff awoke from surgery, he reported numbness in his genital and anal region. Zimmering informed the plaintiff that he had touched one of the plaintiff's nerve roots during the surgery. This occurred during Zimmering's use of electrocautery to stop the plaintiff's bleeding. Zimmering stated that he had encountered the nerve in the operative field at approximately the same time that he realized the plaintiff had spina bifida occulta (SBO). SBO is a common congenital anomaly of the sacral spine. In the plaintiff's case, his condition resulted in a fifteen millimeter gap in the bony protective covering of his spinal column.

Before the surgery, Zimmering had taken plain X rays[1] of the plaintiff's back, including the region where the

---

[1] Plain X rays differ from other diagnostic tests such as a magnetic resonance imagining (MRI) or computerized axial tomography (CAT) scan. An X ray is defined as "A high-energy electromagnetic wave varying in length from 0.05 to 100 angstrom units. X rays are produced by bombarding a target in a vacuum tube with high-velocity electrons. Because of their ability to penetrate most solid matter to some extent and to act on photographic

SBO was located. At trial, Zimmering testified that he read those X rays himself and did not find them positive for SBO or other anomalies. Zimmering further testified that he was familiar with diagnosing SBO on X rays and, in fact, had diagnosed SBO in other patients. He also testified that he would be looking for SBO in a preoperative workup of a patient and if he had detected SBO on the plaintiff's X rays, he would have noted it in his office notes. The plaintiff's X rays were missing at the time of trial. The plaintiff presented the testimony of Avi Bernstein, a physician who stated that an orthopedic surgeon needed to be aware of SBO before surgery in order adequately to protect exposed nerve roots. Zimmering performed a second surgery on the plaintiff to decompress disks and to explore the spinal nerves.

The plaintiff's nerve injury is called cauda equina syndrome. This resulted in the plaintiff's permanent bowel, bladder and sexual dysfunction. The plaintiff's complaint included, inter alia, allegations that his cauda equina syndrome was caused by Zimmering's failure to diagnose the plaintiff's SBO condition and consequently causing damage to the nerve roots during surgery.

The plaintiff claims that the court improperly excluded the testimony of Barry Pressman, one of his experts. On January 2, 2001, only three weeks before the

film, they are used both in diagnosis and therapy." Am. Jur., Proof of Facts 3d, pp. 2029–30 (16th Ed. 1989).

An MRI, also know as nuclear magnetic resonance imagining, is described by the following language. "When certain atomic nuclei with an odd number of protons or neutrons or both are subjected to a strong magnetic field, they absorb and re-emit electromagnetic energy. Analysis of the net magnetization vector's deflection by application of a radiofrequency pulse provides image information. This technique is valuable in providing images of the heart, large blood vessels, brain, and soft tissues." Id., 1152, 1226.

A CAT scan is defined as the "[u]se of a computer to produce, from X ray data, a cross-sectional view of the anatomical part being investigated." Id., 307.

trial started, the plaintiff disclosed Pressman, a board certified neuroradiologist,[2] as an expert witness. Four days after the opening statements, Pressman's testimony was videotaped because he was not able to testify in person. Approximately two weeks after opening statements, outside the presence of the jury, the court reviewed Pressman's testimony and ruled on Zimmering's objections to various questions. Zimmering objected to a portion of Pressman's testimony concerning the reading of X ray films for the presence of SBO. Zimmering objected because it was not established in the testimony whether Pressman was referring to the standard of care applicable to a board certified diagnostic neuroradiologist or to an orthopedic surgeon reading an X ray.

The court sustained the objection with respect to that portion of Pressman's testimony. The court stated that General Statutes § 52-184c requires that an expert witness in a medical malpractice case "possess a sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine so as to be able to provide such expert testimony as to the prevailing professional status of care given in a field of medicine. And as counsel had indicated, the given field of medicine here is an orthopedist's reading of X rays. And in his answer, it is clear that [Pressman] is answering not as a radiologist who knows what the standard of care is for an orthopedist reading X rays, but instead talks about and refers to his training as the colloquial 'we.' Had it been pursued and indicated it was some kind of general training and not training specific to him as a neuroradiologist, the question may have been able to stand with the answer. But without it being pursued it could mislead the jury to believe that that is the specific training of an orthopedist when the evi-

---

[2] According to the plaintiff's brief, a neuroradiologist is a board certified radiologist with an added certified qualification in neuroradiology.

dence doesn't suggest it." The court continued and stated: "The foundation is not properly laid for whether this neuroradiologist can testify as to the standard of care that an orthopedist reading an X ray would have exercised in regard to these questions."

On February 13, 2001, the plaintiff called Zimmering to testify in an attempt to lay the foundational element missing from Pressman's testimony. The court stated: "Pressman still does not comply with § 52-184c, the utilization of Dr. Zimmering for that purpose the court finds inadequate because [Zimmering] can't put himself in the place or mind of a board-certified radiologist in terms of whether that doctor giving an opinion as to the standard of care is giving an opinion as to the standard of care for a board certified radiologist versus a similar health care provider to Dr. Zimmering, which would be a radiologist." On February 13, 2001, the testimony of Pressman, except for the excluded portions, was read to the jury.

The plaintiff later asked the court to articulate the basis of the exclusion of the testimony. The court replied that "it has not been established that the opinions [Pressman] gave in regard to the reading of [SBO] on the preoperative X rays were and as to the standard of care in regard to that, putting in plain language, it was his opinion that it should have been seen, that [SBO] was there.

"It was not laid as a foundation and a qualification whether [Pressman] was indicating that it should have been seen by someone such as himself. He in fact colloquially referred to as we at one point in his testimony as a board-certified diagnostic radiologist which is not the standard that Dr. Zimmering in fact is held to under 52-184c (b) because Dr. Zimmering is a board certified orthopedic surgeon and in all of his other work, for instance the surgery, he is held to the standard of a

board certified orthopedic surgeon, but in his work reading as a radiologist, the court finds under subsection (b) that he is held to a lesser standard, that basically of a similar health care provider, which in this instance would be, for a lack of a better way to put it, plain old radiologist to distinguish from a board certified diagnostic radiologist and there is no foundation laid that the opinion offered by Dr. Pressman regarding to the reading of those plain X rays, the AP X rays, was the standard of care for a 'plain old radiologist' to be distinguished from what he was testifying as and that he is a board certified diagnostic radiologist."

On the same day, the plaintiff requested an opportunity to conduct a telephone deposition of Pressman. The defendants objected on numerous grounds, including the facts that closing arguments were scheduled for the following day, that Pressman would not be available until 9 or 10 p.m. that evening, and that the defendants had a right to be present at any deposition. The court sustained this objection and the plaintiff does not claim on appeal that the court abused its discretion in doing so. On February 16, 2001, the jury returned a verdict in favor of the defendants. This appeal followed.

We begin by discussing the standard of review of a court's decision to exclude portions of a witness' expert testimony. "A trial court's decision on whether to impose the sanction of excluding the testimony of a party's expert witness rests within the court's sound discretion. . . . The action of the trial court is not to be disturbed unless it has abused its broad discretion, and in determining whether there has been such abuse every reasonable presumption should be made in favor of its correctness." (Citations omitted.) *Pool* v. *Bell*, 209 Conn. 536, 541, 551 A.2d 1254 (1989); see also *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 548–49, 733 A.2d 197 (1999). "There are no precise facts that must be proved before an expert's opinion may be

received in evidence. . . . Rather, it is largely a matter of judicial discretion as to whether a witness has been shown to have sufficient experience and opportunity of observation to render his opinion." (Citation omitted; internal quotation marks omitted.) *Hammer* v. *Mount Sinai Hospital*, 25 Conn. App. 702, 718, 596 A.2d 1318, cert. denied, 220 Conn. 933, 599 A.2d 384 (1991).

The defendants first claim that this court should not review the plaintiff's appeal because the plaintiff has failed to brief his claim of error adequately according to Practice Book § 67-4 (d)(3).[3] Specifically, the defendants argue that the plaintiff did not include a verbatim statement of the objection and the ground on which the evidence was claimed to be admissible. The defendants are correct that the plaintiff has not complied with our appellate rules. This court can decline to address evidentiary claims that are inadequately briefed; see *Malto* v. *Dermatopathology Associates of New York*, 55 Conn. App. 592, 596–97, 739 A.2d 1284 (1999); however, the plaintiff has supplied the necessary transcript, and this court, following a thorough review of the transcript, is able to discern which objections the plaintiff is challenging.

The plaintiff's claim that the court improperly precluded portions of Pressman's testimony is based on the construction of General Statutes § 52-184c.[4] Specifi-

[3] Practice Book § 67-4 (d) (3) provides: "When error is claimed in any evidentiary ruling in a court or jury case, the brief or appendix shall include a verbatim statement of the following: the question or offer of exhibit; the objection and the ground on which it was based; the ground on which the evidence was claimed to be admissible; the answer, if any; and the ruling."

[4] General Statutes § 52-184c provides in relevant part: "(a) In any civil action to recover damages resulting from personal injury or wrongful death . . . in which it is alleged that such injury or death resulted from the negligence of a health care provider . . . the claimant shall have the burden of proving by the preponderance of the evidence that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. The prevailing professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances,

cally, the plaintiff argues that Pressman's testimony was admissible under § 52-184c (d). We, therefore, must first analyze the statute to ascertain whether Pressman's testimony was admissible. Our review of a court's construction of a statute is plenary. See *Morrison* v. *Parker*, 261 Conn. 545, 548, 804 A.2d 777 (2002). In doing so, "we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 764, 628 A.2d 1303 (1993).

We first look at the statutory language. Subsection (a) of the statute incorporated our then existing com-

---

is recognized as acceptable and appropriate by reasonably prudent similar health care providers.

"(b) If the defendant health care provider is not certified by the appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself out as a specialist, a 'similar health care provider' is one who: (1) Is licensed by the appropriate regulatory agency of this state or another state requiring the same or greater qualifications; and (2) is trained and experienced in the same discipline or school of practice and such training and experience shall be as a result of the active involvement in the practice or teaching of medicine within the five-year period before the incident giving rise to the claim.

"(c) If the defendant health care provider is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself out as a specialist, a 'similar health care provider' is one who: (1) Is trained and experienced in the same specialty; and (2) is certified by the appropriate American board in the same specialty; provided if the defendant health care provider is providing treatment or diagnosis for a condition which is not within his specialty, a specialist trained in the treatment or diagnosis for that condition shall be considered a 'similar health care provider'.

"(d) Any health care provider may testify as an expert in any action if he: (1) Is a 'similar health care provider' pursuant to subsection (b) or (c) of this section; or (2) is not a similar health care provider pursuant to subsection (b) or (c) of this section but, to the satisfaction of the court, possesses sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide

mon law by providing that it was the plaintiff's burden to prove a "breach of the prevailing professional standard of care" applicable to the physician being sued. See *Cross* v. *Huttenlocher*, 185 Conn. 390, 393, 440 A.2d 952 (1981). Subsection (a) also codified then existing common law by providing: "The professional standard of care for a given health care provider shall be that level of care, skill and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." See *Marshall* v. *Yale Podiatry Group*, 5 Conn. App. 5, 7, 496 A.2d 529 (1985) (standard of care for surgeons is that of those in same general neighborhood and in same general line of practice which they ordinarily exercise in similar cases).

For Pressman to have been allowed to testify regarding the standard of care of an orthopedic surgeon such as Zimmering, he would have to have qualified under either statutory subsections (b), (c) or (d). Pressman did not qualify under § 52-184c (b) because that subsection applies only if the defendant health care provider, Zimmering, was not board certified as a specialist, was not trained and experienced in a medical specialty, or did not hold himself out as a specialist. General Statutes § 52-184c (b). Because Zimmering was a board certified orthopedic surgeon, this subsection was not applicable.

Pressman's testimony was also not admissible under § 52-184c (c). This subsection requires that if the defendant health care provider has a specialty, then an expert witness may testify only if he is trained, experienced and board certified in the same specialty as the defendant. General Statutes § 52-184c (c). Because Zimmering was a board certified orthopedic surgeon, while Pressman was a board certified neuroradiologist, § 52-

such expert testimony as to the prevailing professional standard of care in a given field of medicine. . . ."

184c (c) is not applicable. Furthermore, Zimmering did not provide treatment to the plaintiff that was outside his specialty to satisfy the remaining alternative provided in subsection (c).

The only remaining statutory alternative, therefore, under which Pressman could have qualified to render an opinion as to the standard of care of an orthopedic surgeon would be § 52-184c (d). Because Pressman did not qualify as a similar health care provider under subsections (b) or (c), he had to meet the criteria of subsection (d) (2), which provides in relevant part that he must, "to the satisfaction of the court, [possess] sufficient training, experience and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. . . ." Section 52-184c (d) addresses "overlap" areas among the different fields of medicine.

The legislative history of § 52-184c fails to provide us with further context for the plain meaning of the statute. However, the purpose and policy underlying the statute was to codify who might testify on the prevailing professional standard of care in actions against health care providers. The statute's title and contents are directed solely to that subject matter. Subdivision (2) of § 52-184c (d) seems to deal with situations where specialties overlap, provided the party offering the witness' testimony establishes to the satisfaction of the court that he "possesses sufficient training, experience and knowledge . . . in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. . . ." General Statutes § 52-184c (d) (2).

Such a construction of the statute is consistent with prior common-law principles. The common law permit-

ted physicians acting in a different specialty to testify as to the standard of care in the defendant's specialty as long as they knew what constituted the standard of care for the specialty about which he was called to testify. See *Fitzmaurice* v. *Flynn*, 167 Conn. 609, 618, 356 A.2d 887 (1975); *Ardoline* v. *Keegan*, 140 Conn. 552, 557, 102 A.2d 352 (1954). Our case law has recognized that there are overlaps where artificial lines that demarcate one specialty from another dissolve when certain procedures or diagnoses are involved. See *Marshall* v. *Hartford Hospital*, 65 Conn. App. 738, 758, 783 A.2d 1085, cert. denied, 258 Conn. 938, 786 A.2d 425 (2001).

We therefore differ with the court in its interpretation of § 52-184c when it issued its articulation on its ruling precluding portions of Pressman's testimony. In our opinion, subsection (b) of that statute is not applicable to Pressman's testimony because it expressly applies only to defendant health care providers who, unlike Zimmering, are not board certified specialists, not trained or experienced in a specialty or do not hold themselves out as specialists. This court, however, is "authorized to rely upon alternative grounds supported by the record to sustain a judgment. . . . Where the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it." (Citation omitted; internal quotation marks omitted.) *Kelley* v. *Bonney*, 221 Conn. 549, 592, 606 A.2d 693 (1992). There is no reason to depart from this principle in this case. This is so because prior to its articulation, the court issued a ruling on the record concerning the defendants' objections to Pressman's testimony. That ruling is completely consistent with § 52-184c (d) and prior case law.

In *Pool* v. *Bell*, supra, 209 Conn. 542, our Supreme Court squarely addressed situations in which a physician in one specialty is called to testify as to the profes-

sional standard of care applicable to another specialty. *"The witness must demonstrate a knowledge acquired from experience or study of the standards of the specialty of the defendant physician sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards, and not to the standards of the witness' particular specialty if it differs from that of the defendant. . . .* Without ruling on the correctness of the overlap standard . . . the crucial question is whether . . . [the expert] knows what . . . [the standards of practice] are." (Citations omitted; emphasis added; internal quotation marks omitted.) Id.

The plaintiff claims that the court excluded portions of Pressman's testimony because "he was incompetent to testify regarding the standard of care applicable to [the defendants] when he read the X rays that he took of [the plaintiff's] lower back." This part of Pressman's testimony was excluded properly and its exclusion was not an abuse of the court's discretion because there was an inadequate foundation as to whether Pressman knew what the standard of care was for orthopedic surgeons when reading plain X rays and whether he was holding Zimmering to that standard and not some different one applicable to his distinct specialty. The excluded portions dealt with Pressman's opinion concerning the standard of care that Zimmering should have exercised when reading the plaintiff's X rays. The court concluded that it was not clear that Pressman was testifying about the standard of care that an orthopedic surgeon would be expected to achieve when interpreting the X rays, and, therefore, those portions were redacted from the deposition which was read.

Pressman's testimony was excluded properly because it is unclear from the record whether he was testifying as to a standard of care expected of a board certified neuroradiologist, his own field, or an orthope-

dic surgeon reading plain X rays, the defendant's specialty. The foundation question simply was never asked to Pressman concerning which standard of care was applicable to Zimmering. In discussing the standard, Pressman used the word "we" and the antecedent of that pronoun was not known. It was, therefore, impossible to know whether he was referring to a standard for a neuroradiologist or for an orthopedic surgeon or both.

The record reveals that Pressman never stated that he was testifying as to the standard of care applicable to an orthopedic surgeon. The court, therefore, did not abuse its discretion by excluding those portions of Pressman's testimony concerning the standard of care that is applicable to orthopedic surgeons when reading plain X rays.

The judgment is affirmed.

In this opinion the other judges concurred.