STATE OF CONNECTICUT *v.* JOHN G.[1]
(AC 22494)

Schaller, Flynn and West, Js.

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victims or others through whom their identities may be ascertained. See General Statutes § 54-86e.

Argued May 30, 2003—officially released January 6, 2004

*Martin Zeldis*, senior assistant public defender, with whom, on the brief, was *Debra Munson*, certified legal intern, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Cornelius P. Kelly*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, John G., appeals from the judgment of conviction, rendered following a jury

trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 and risk of injury to a child in violation of General Statutes (Rev. to 1993) § 53-21. The defendant claims that the court improperly (1) admitted into evidence a letter written by the victim and (2) allowed a constancy of accusation witness to testify as an expert regarding the victim's delay in reporting the abuse. We agree with the defendant that the court's admission into evidence of the victim's letter was improper because the information contained in that letter was both irrelevant to the central issues of the case and prejudicial. We reverse the judgment of conviction on that basis. Because our resolution of the defendant's first claim is dispositive of this appeal and the second claim is not likely to recur on retrial, we need not address the remaining claim.

The following facts are relevant to the defendant's appeal. The criminal charges against the defendant stem from allegations that he sexually molested his step-granddaughter during a nine month period while she was residing in his home. The alleged assaults began in September, 1993, one month prior to the victim's twelfth birthday. The victim made the allegations of abuse during counseling sessions that she attended while she was a college freshman nearly seven years after the alleged abuse had occurred.[2] According to the victim's testimony, she began counseling because she was concerned about the safety of her younger sister and wanted to find ways that she could protect her from similar molestation. On the advice of a school counselor, the victim subsequently disclosed the alleged abuse to her parents and to the department of children and families. The department of children and

---

[2] Prior to that time, she had not mentioned the abuse to anyone other than her boyfriend, to whom she had confided during her senior year of high school.

families, in turn, advised the victim to contact the police, which she did.

The defendant was arrested in April, 2000, and was charged with sexual assault in the first degree and risk of injury to a child. The defendant pleaded not guilty to those charges. Following a trial to the jury, the defendant was convicted of both charges and was sentenced to a total effective term of ten years of incarceration suspended after two years.

I

The first claim that the defendant raises on appeal is that the court improperly allowed into evidence a letter written by the victim to her parents following his arrest. The defendant argues that the letter was irrelevant to the issues in the case and that its introduction was unduly prejudicial. The state argues that the letter was admissible pursuant to several different theories.

The following additional facts are necessary for our resolution of the defendant's claim. During its direct examination of the victim, the state offered into evidence a letter written by the victim to her parents. The prosecution offered the letter under the state of mind exception to the hearsay rule. That letter read: "Dear Mom and Dad, It's killing me right now to write this letter but there are a few things I think you need to know. This is the only way I'll be able to tell you. I have to start from the beginning.

"I've been sexually abused we all know that. By your father-in-law, Mom and Dad by your father. Yes, your father! Don't try to defend him anymore. Let it go and accept that your father is a pig who has done *your* daughter very wrong. I have done *nothing* to deserve this then or now. I would walk to his house from the school bus and go inside say hi, kiss on the cheek,

whatever. From what I remember, I would stand in front of his desk in his room, for whatever reason, and he would come from behind me and stick his hands down my pants and begin to touch me. Sometimes I would lay on the bed to get some rest (not for any sexual attention!!) and he would stand next to me and take my hands and rub his [genitals]. When you came to pick me up, Mom, I would say good-bye and give him a kiss, as we do to everyone else in the family, and he would try to stick his tongue in my mouth. I've been woken up at 6:30 in the morning *to him performing oral sex* on me. This man told me he loved me and would never do anything to hurt me, however I could not say anything to mom or dad. (Those were his words) So as my so called grandfather I did as he said and told no one. I was eleven and twelve years old. I knew absolutely nothing about this subject. All I knew is that he was my grandfather and I was to respect him.

"For years afterwards I pushed it to the back of my mind and denied it not realizing the multiple effects it was having on me. [Sophomore] year I got into a lot of trouble as you know. I was depressed, [suicidal], angry, hurt, stressed and was calling out for help and attention. Everything I did was to be noticed. This man confused me, traumatized me, robbed me of my childhood[3] and made me just want to give up and die. But I pulled through it all, Thank God. Till this day, 7 years later, I am still angry, hurt, and very scared. I trust very little people and speak very little when there are people around that I'm not comfortable with. I have dealt with this too long by myself. For my little sister, one, and for myself, two, I will put this man, this pig of a man away with or without your help. Dad, counseling is not enough for him. If you could only understand what he has done. You are [supposed] to be my father and be

---

[3] The phrase "robbed me of my childhood" was redacted before the letter was published to the jury. ,

protecting me. Well, right now you are only protecting him as if he is the victim. If it was anybody else who did this you would of went out and killed him already. So what is the difference. I can't believe you would even come to me and ask me to drop charges. He has not been through nearly as much as I have. Some [embarrassment] and [humiliation] is nothing compared to what he has made me live with (and will have to live with for the rest of my life). As far as I am concerned you are worried about yourself and not about me at all. If your cousins are the cousins you say they are then they will help you in this too. You need to start thinking about your family and realize that you are pushing another one of your daughter's away. Or am I different because I'm not your blood? Sometimes I wonder, if it was Annie how would you be acting?

"Mom, either [you're] with me 100% or [you're] not with me at all. All I want is your support. I don't want you to come to court with me and start talking for me. That is what you did last week. You told the prosecutor what you and your husband want. Not what I want. This is my case and it is between me and 'him.' If your husband is going to keep you from supporting me 100% then I don't need any support at all.

"Oh and right now the court and trial is out of my hands. He could have pleaded guilty and [faced] the consequences, but he wants to fight it all the way. So he is the one putting himself through all this. He wants to go to trial. So don't blame me for what happens to him from here on.

"If you are wondering how I am feeling now, why I am not talking to you Dad—I am scared, I am angry, hurt and feel very alone. I feel betrayed by my own parents. I am not blaming you at all for what happened then, either one of you because it wasn't my fault and it wasn't your fault. But I am very angry and upset that

I don't have your support, from mom or dad. (If I don't have all your support, then I don't have any of it.) And the fact that I have not said anything to you, Dad, not have I looked at you in the past 1½ months, and you notice this but can not come to me and find out why. You had no problems talking to me about dropping the charges all *3 times!* Why is it so hard for you to come talk to me about how *I'm* feeling. Or don't you care? I am sorry, very sorry all this has happened but we can't push it away and ignore it anymore. I have done that for far too long. As far as I'm concerned this household is very split and broken up because nobody wants to talk about what is bothering them. Everyone walks around like they are made of steel pretending not to have any problems (including myself but at least I am writing this letter which is a bit more than anyone else has done.) I love you both very much and ask for only, only your 100% support and stop pressuring me to do what is not possible." (Emphasis in original.)

During its offer of proof, the state argued that the letter was relevant to show the victim's state of mind with respect to why she waited to come forward with her allegations. The state also argued that the letter properly was admissible as nonhearsay constancy of accusation evidence pursuant to *State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996) (en banc). Finally, the state attempted to justify admission of the letter under the state of mind exception to the hearsay rule on the ground that it was relevant to the establishment of an essential element of the charge of risk of injury to a child. Specifically, the state argued that the description within the letter of her acting out and getting into trouble as a consequence of the defendant's molestation was relevant to establishing that the defendant's actions did have the effect of impairing her health or morals.

At one point during the state's argument regarding the admission of the letter pursuant to *Troupe*, defense

counsel stated that he "[didn't] mind the [court's] strict reading of *Troupe*, but that would negate 98 percent of the letter." The court replied, "It may. It very well—" Following some additional argument regarding the letter's admissibility pursuant to the constancy of accusation doctrine, the court stated that it would allow the state to make an offer of proof regarding the reason that the victim wrote the letter and that the court then would make its ruling on the basis of the victim's response.

Defense counsel reiterated that he had no problem with the letter's being admitted pursuant to *Troupe*, provided that the letter was redacted in such a way that only the very limited information permissible under *Troupe* would be before the jury. Defense counsel, however, strenuously objected to the letter's being admitted under the state of mind exception to the hearsay rule to prove impairment of the victim's health and morals. The court stated that it would allow the letter into evidence under the state of mind exception to the hearsay rule as relevant to establish impairment of the victim's morals.

Outside of the presence of the jury, the prosecution then posed some questions to the victim concerning the letter.[4] Following the questioning of the victim, the

---

[4] The following colloquy took place:

"[The Prosecutor]: I'm going to show you what has been marked state's exhibits 1a and 1. I believe you identified these before, and what are those?

"[The Witness]: The letter that I wrote to my parents.

"[The Prosecutor]: Okay. Do you remember when it was that you wrote that letter?

"[The Witness]: It was the end of summer.

"[The Prosecutor]: Which summer was that? This summer or last summer or—

"[The Witness]: Last summer.

"[The Prosecutor]: The year 2000?

"[The Witness]: Two thousand.

"[The Prosecutor]: Okay. Did anybody force you to write that letter?

"[The Witness]: No, it was suggested to me.

"[The Prosecutor]: By whom?

court and counsel discussed the scope of the questions

"[The Witness]: By the counselor that I was seeing.

"[The Prosecutor]: Okay. And it makes reference, does it not, in that particular letter [to] certain things that occurred to you after the defendant had contact with you, things that occurred your sophomore year and things of that nature; is that a fair statement?

"[The Witness]: I don't understand the question.

"[The Prosecutor]: Okay. I'll withdraw it. And what was the purpose— let me backtrack. What was the purpose of writing that letter?

"[The Witness]: To let my parents know what was really going on because I had never given them details.

"[The Prosecutor]: Okay. And did you provide details to your parents about the events that occurred between you and your grandfather?

"[The Witness]: In the letter?

"[The Prosecutor]: Yes.

"[The Witness]: Yes.

"[The Prosecutor]: All right. And what was the general nature of that information that you gave to your mom and your dad?

"[The Witness]: It was just to let them know pretty much how I was feeling at that time. Just, you know, to get them more on my side.

"[The Prosecutor]: Okay. Let me backtrack a little bit. You said that you provided your parents—you provided in the letter more details to your parents as to what occurred between you and your—the defendant; is that a fair statement?

"[The Witness]: Yes, yes.

"[The Prosecutor]: In general terms, what was that information that you provided to them as to what took place between the defendant and yourself?

"[The Witness]: When he had put his pants—his hands in my pants and touched my vagina, and when he did the oral sex.

"[The Prosecutor]: In keeping with what you mentioned to us before when the jury was out here?

"[The Witness]: Right.

"[The Prosecutor]: And did you indicate in that letter, if you remember, did you tell your parents when it had happened?

"[The Witness]: I told—it says during the school year—

"[The Prosecutor]: And you are referring back to the school year—

"[The Witness]: The seventh grade.

"[The Prosecutor]: Now, did you also provide details in that letter about how you were affected by what occurred between you and the defendant?

"[The Witness]: Yes.

"[The Prosecutor]: And do you explain to them what you went through while you were growing up until the point that you told somebody about this?

"[The Witness]: Yes.

"[The Prosecutor]: Okay. Now, did the police ask you to write that letter?

"[The Witness]: No.

"[The Prosecutor]: Did your counselor ask you to write that letter?

and responses that would be allowed. The prosecutor conceded that the victim had exceeded the scope of permissible testimony by divulging the actual details of the alleged assault pursuant to the letter. He stated that when he questioned the victim in front of the jury, he would instruct her to talk only about the general nature of the letter's content. Defense counsel objected to questions posed to the victim by the state regarding her feelings over the years. The prosecutor claimed that the questions were relevant to the charge of risk of injury to a child, and the court overruled the defendant's objection.

We begin our analysis of the defendant's claim by setting forth the applicable standard of review. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the

---

"[The Witness]: She never pushed me to. She said it would probably be helpful.

"[The Prosecutor]: And your purpose in drafting that letter was for what, for what purpose?

"[The Witness]: To let my parents know how I was feeling.

"[The Prosecutor]: And is there not a reference in that letter that you spoke to the prosecutor. Is there a reference in that letter?

"[The Witness]: No.

"[The Prosecutor]: If you had a chance to look at that—there is no reference in there. Is that what you are saying?

"[The Witness]: Um-hmm. (Affirmative.)

"[The Prosecutor]: Well, let me ask you this. At any point in time, did you ever come down to the state's attorney's office to speak to me?

"[The Witness]: Yes.

"[The Prosecutor]: And last summer, did you ever do that?

"[The Witness]: Yes.

"[Prosecutor]: Okay. And at that point, did I make a request of you to draft a letter—to draft that letter?

"[The Witness]: No.

"[The Prosecutor]: I have nothing further, Your Honor."

trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Moody*, 77 Conn. App. 197, 204, 822 A.2d 990, cert. denied, 264 Conn. 918, 827 A.2d 707 (2003).

A

We first address the defendant's claim that the court improperly admitted the victim's letter under the state of mind exception to the hearsay rule for the purpose of establishing an actual impairment of her health or morals under the charge of risk of injury to a child. In objecting to the admission of the letter on that ground, the defendant argued that it was not necessary to show an actual impairment of a victim's health or morals to prove a violation of § 53-21. Rather, the defendant argued, all that is required is proof of a touching of a minor's intimate parts. The state argues, inter alia, that the court's admission of the letter was not improper because the letter was appropriate evidence that the defendant's conduct impaired the victim's morals and that such a factual finding was necessary for a conviction pursuant to § 53-21. Specifically, the state argues that the letter's recitation of the victim's "acting out" behavior was relevant to establish that the victim's health or morals actually had been impaired pursuant to § 53-21. We agree with the defendant that the statements contained in the letter were not relevant to proving that element of the charged crime.

"[A]n out-of-court statement that is offered to establish the truth of the matter asserted is inadmissible hearsay unless the statement falls within a recognized exception to the hearsay rule. . . . One such exception provides that statements expressing a declarant's present state of mind may be offered for the truth of the matter asserted, *if relevant*. See Conn. Code Evid. § 8-3 (4) . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn.

336, 355–56, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). If a witness' state of mind is not a relevant factual issue in the case, the state of mind exception does not apply. *State* v. *Soto*, 59 Conn. App. 500, 506, 757 A.2d 1156, cert. denied, 254 Conn. 950, 762 A.2d 906 (2000).

In 1993, at the time of the charged conduct, § 53-21 proscribed any person from doing "any act likely to impair the health or morals of any [child under the age of sixteen years] . . . ." General Statutes (Rev. to 1993) § 53-21. Section 53-21 was subsequently revised in 1995 to include an explicit proscription against having "contact with the intimate parts . . . of a child under the age of sixteen years or [subjecting] a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . ." General Statutes § 53-21 (a). Notwithstanding the absence from the 1993 version of the statute of any mention of sexually explicit conduct, our case law at that time was abundantly clear that the touching of the private or intimate parts of a person younger than sixteen years of age constituted, per se, conduct "likely to impair the morals" of such child. See, e.g., *State* v. *Perruccio*, 192 Conn. 154, 159–61, 471 A.2d 632, appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984); *State* v. *Pickering*, 180 Conn. 54, 63–65, 428 A.2d 322 (1980). Thus, in the present case, all that was required to support the defendant's conviction pursuant to § 53-21 was evidence that such touching of the victim's intimate parts occurred and that it occurred in an indecent manner.

The state did not need to demonstrate actual impairment of the victim's morals by introducing evidence of the victim's subsequent actions or mental state. The state also did not need to introduce such evidence to support a finding that a defendant's touching of the

intimate parts of a person younger than sixteen years of age was conduct proscribed by the statute as likely to impair the morals of the victim. Consequently, the statements contained in the letter, reflecting the victim's mental state at the time of trial, when it was written, were not relevant to prove whether the defendant's actions were likely to impair her morals.[5] Accordingly, we conclude that the court abused its discretion in admitting the letter into evidence to prove an actual impairment of the victim's health or morals.[6]

## B

The state argues that even if the letter was admitted improperly as relevant to the issue of impairment of the victim's morals, it was nevertheless admissible on alternate grounds. We recognize that a reviewing court may rely on alternate grounds for sustaining a judgment of the trial court. *Friedman* v. *Meriden Orthopaedic Group, P.C.*, 77 Conn. App. 307, 317, 823 A.2d 364, cert. granted on other grounds, 265 Conn. 905, 831 A.2d 249 (2003). "Where the trial court reaches a correct decision but on mistaken grounds, this court has repeatedly sustained the trial court's action if proper grounds exist to support it." (Internal quotation marks omitted.) Id. We therefore consider whether the letter would have

[5] Although the state concedes that no actual impairment need be proven to establish risk of injury to a child, the state nevertheless argues that such proof of actual impairment proves, a fortiori, the likelihood of impairment. For the reasons previously given, we reject that argument and conclude that such proof of actual impairment is completely irrelevant under the risk of injury statute.

[6] We note as well that the court also ultimately failed to require the state to redact the letter significantly, despite conditioning the letter's admission on such redaction. The court stated: "Yes, well, a good amount [of the letter] would have to be redacted. . . . [T]he court is agreeing to allow [the letter] in on that exception. But, again, to be redacted, and I have a feeling that it's not going to be easily done." In the end, only one phrase, "robbed me of my childhood," was removed from the text before the letter was published to the jury.

been admissible under either of the two alternate grounds proposed by the state.

The first of the alternate grounds proposed by the state is that the letter was admissible under the constancy of accusation doctrine pursuant to *State* v. *Troupe*, supra, 237 Conn. 298. The state argues that the constancy of accusation doctrine was applicable because the letter contained references to the victim's having reported the defendant's actions to her parents. In support of its argument, the state cites our holding in *State* v. *Bispham*, 48 Conn. App. 135, 146–47, 708 A.2d 604 (1998), appeal dismissed, 249 Conn. 264, 731 A.2d 294 (1999), that a written statement, as well as an oral statement, made by a sexual assault victim is admissible as constancy evidence.

We agree that the dispositive factor in deciding whether a victim's statement properly is admissible as constancy of accusation evidence is not whether such statement is written or oral. As we stated in *Bispham*, if a sexual assault victim's statement otherwise satisfies the criteria for admission as constancy of accusation evidence, the fact that the statement is written rather than oral will not preclude its admissibility.

Constancy evidence, whether written or oral, however, must be limited strictly to "the fact and timing of the victim's complaint; any [evidence] regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator." *State* v. *Troupe*, supra, 237 Conn. 304. It is not appropriate for a party to use constancy evidence to place before the jury the details of an alleged sexual assault. Id., 304–305. "Additionally, to admit the constancy of accusation testimony, the trial court must nevertheless, balance the probative value of the evi-

dence against any prejudice to the defendant." (Internal quotation marks omitted.) *State* v. *Kelly*, 256 Conn. 23, 36, 770 A.2d 908 (2001).

The parties argued the admissibility of the letter pursuant to the constancy of accusation doctrine at some length. Although the court appears to have agreed that at least some portion of the letter might be admissible as constancy evidence, it cautioned the state that a great deal of the material would probably have to be redacted to comply with *Troupe.*

In the present case, the wholesale admission of the contents of the letter was a clear violation of the limiting strictures that our Supreme Court took great pains to impose on the scope of admissible constancy of accusation evidence. The letter contained references to the defendant's touching the victim's genitals and performing oral sex on the victim. Despite the court's explicitly having conditioned the letter's admission into evidence on significant redaction, the descriptions of the sexual assaults contained in the letter remained. See footnote 4.

The relevancy of the statements contained in the letter also was diminished significantly by the fact that the statements were made only after charges had been brought against the defendant. "The rationale [behind the constancy of accusation doctrine] stems from the ancient belief that a victim of a violent crime would naturally cry out immediately after an assault and that, by implication, if such a victim did cry out, her complaint was more likely true. . . . That belief led to the corresponding supposition that a jury would treat with skepticism one who did not cry out soon after she was attacked. . . . So profound was the belief in that sociological phenomenon, and so entrenched was the distrust in a victim's delayed complaint, that proof of

'hue and cry' became a formal prerequisite for the prosecution of any rape case. . . .

"With the advent of the hearsay rule in the early 1800s, an exception was carved out for those fresh complaints, partially as a means to dispel the jury's inclination to distrust the victim if there were a delay in reporting. . . . Its use thereby forestalled the inference that the victim's silence was inconsistent with her present formal complaint of rape. . . . In effect, the fresh complaint rule allowed a victim to testify that she had told others about an alleged sexual assault as anticipatory rebuttal against an attack on her credibility, either by the defendant or by the unspoken bias of jurors who, it was presumed, would tend to discredit a victim's claims unless she offered testimony that she had complained soon after the assault.

"The fresh complaint rule, in turn, spawned our current constancy of accusation doctrine. Accordingly, those to whom a victim purportedly made a complaint are permitted to testify that such a complaint was, in fact, made to them. That testimony is permitted to corroborate the victim's testimony that she made such a complaint." (Citations omitted; internal quotation marks omitted.) *State* v. *Samuels*, 75 Conn. App. 671, 674–75, 817 A.2d 719, cert. granted, 263 Conn. 923, 823 A.2d 1216 (2003).

We recognize that contemporary empirical studies have discredited the fundamental assumption underlying the historical development of the fresh complaint and constancy doctrines, that it is natural for the victim of a sexual assault to complain promptly following an assault. See *State* v. *Troupe*, supra, 237 Conn. 300–306. Accordingly, any delay between the time of the assault and the time of the victim's disclosure of it pertains to the weight of the constancy evidence rather than to its admissibility. Id., 298. When, as in the present case,

however, the "constancy evidence" is comprised of statements made after a complaint has been made to the police and the trial has commenced, we cannot conclude that the evidence has any value in supporting the victim's credibility or dispelling the suspicion of fabrication. See *State* v. *Samuels*, supra, 75 Conn. App. 685.

## C

The state also argues, albeit rather cursorily, that the letter was admissible as nonhearsay because it demonstrated that the victim had experienced the type of mental or emotional state typical of a sexual assault victim. The state claims that the letter would be admissible as nonhearsay because it was not being offered for the truth of the matters asserted therein, but rather to illustrate circumstantially the victim's mental state. Thus, the state argues that the letter was admissible because it was relevant to the ultimate issue of whether a sexual assault had occurred.

The state relies on *State* v. *Brown*, 59 Conn. App. 243, 247–48, 756 A.2d 860 (2000), appeal dismissed, 256 Conn. 740, 775 A.2d 980 (2001), in support of its argument. In *Brown*, we held that the testimony of the victim's aunt regarding her observations of the victim's conduct following a sexual assault was admissible as nonhearsay. Id. The state's reliance on *Brown*, however, is misplaced. Our holding in *Brown* was predicated on the fact that the witness was testifying as to her observations of the victim's nonassertive conduct. Id., 247 (conduct not *intended* as assertion not hearsay; thus, *nonassertive* conduct such as running to hide, or shaking and trembling, not hearsay). In the present case, however, we are not confronted with testimony concerning the victim's observed nonassertive conduct, but rather with statements made by the victim herself. Those statements not only were assertive, but they were

intended by the victim to be persuasive and, specifically, to provide a linkage between her claimed instances of "acting out" and the alleged sexual assault. In fact, the victim admitted that one of her reasons for writing the letter was to get her parents on her side. See footnote 4.

We also note that in *Brown*, unlike in the present case, testimony about the victim's conduct, which was deemed admissible as proof that the sexual intercourse between the victim and the defendant was not consensual, was exhibited shortly after the alleged assault. See *State* v. *Brown*, supra, 59 Conn. App. 247 n.3. Here, the victim's letter was written nearly seven years after the alleged assaults occurred and for the express purpose of marshaling her parents' support during the ongoing criminal proceeding.

## II

Having concluded that the victim's letter was inadmissible under any of the theories advanced by the state, we must now determine whether the court's admission of that letter into evidence was so prejudicial as to warrant reversal of the defendant's conviction. See *State* v. *Dehaney*, supra, 261 Conn. 363–64.

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) Id., 364. "[E]videntiary rulings will be overturned on appeal only where there was an abuse of discretion *and* a showing by the defendant of substantial prejudice or injustice." (Emphasis added; internal quotation marks omitted.) *Gombos* v. *Aranoff*, 53 Conn. App. 347, 357, 730 A.2d 98 (1999).

Our Supreme Court has recognized that it has not been fully consistent in its articulation of the standard for establishing harm. *State* v. *Dehaney*, supra, 261 Conn. 364. "One line of cases states that the defendant must establish that it is more probable than not that

the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Young*, 258 Conn. 79, 95, 779 A.2d 112 (2001).

Although our Supreme Court has not yet resolved that inconsistency, we conclude that the defendant has met his burden under either standard. We conclude that improper admission of the statements contained in the victim's letter likely affected the outcome of the trial and was so prejudicial as to undermine confidence in the fairness of the verdict. The statements contained in the letter were not cumulative of other evidence properly before the jury. Cf. *In re Latifa K.*, 67 Conn. App. 742, 752, 789 A.2d 1024 (2002) (evidence not harmful because merely cumulative). Indeed, the victim's mother and stepfather both testified that they had supported the victim and the choices that she was making regarding the prosecution of the case. That testimony directly contradicted the accusations contained in the letter that the victim's stepfather was attempting to protect the defendant and that her mother's support was equivocal.

Although both the state and the defendant called several witnesses to testify, the case before the jury essentially involved a credibility contest between the victim and the defendant. The testimony of those witnesses who testified on the victim's behalf was not offered for substantive purposes, but rather was admitted solely as constancy of accusation testimony.[7] Even

---

[7] The state called to testify, in addition to the victim's mother and stepfather, a school psychologist and staff counselor from the university she attended, and a retired police detective. The testimony of each was limited to the fact that the victim had disclosed to them the alleged incidents of molestation. Additionally, the victim's parents testified as to her demeanor toward the defendant during the relevant time period.

if we were to credit the letter's assertions regarding the victim's "acting out" behavior and were to conclude further that such behavior was relevant to establishing that the author had been the victim of a sexual assault, she did not offer any testimony to substantiate that she actually exhibited such "acting out" behavior. Indeed, the testimony of the victim's mother established only that she become relatively less sociable toward the defendant during the relevant time period. Such behavior is quite different from the pattern of antisocial aggressiveness suggested by the letter.

Simply put, the improperly admitted statements in the victim's letter did not bear at all on any relevant issue before the trier of fact. Indeed, their sole effect could be only to arouse the emotions and sympathies of the jury in favor of the victim, and to bring contempt and opprobrium on the defendant. The letter contained numerous attacks on the character of the defendant. The letter's gratuitous name-calling directed at the defendant surely had the potential for impermissibly coloring the jury's assessment and opinion. The letter also depicted the victim as being a victim, not only concerning the alleged sexual assaults, but also by virtue of betrayal resulting from her parents' reaction to the allegations. It would be surprising if the letter, expressing the victim's emotional pain and anger, and accusing her parents of not supporting her during the ordeal of the trial, did not have the natural effect of arousing pity and sympathy for the victim. In light of the grossly personal nature of the attacks on the defendant and the emotionally charged accusations raised against the victim's parents, and the inevitable prejudicial impact on the jury of that evidence, we can have no confidence in the fairness of the resulting verdict.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.